UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

FIRST HORIZON CORPORATION

          Plaintiff                                 Civil Action No.

versus                                       District Judge

                                            Magistrate Judge

KARL HOEFER and DMMS HOLDINGS, LLC

          Defendants.

## COMPLAINT AND APPLICATION FOR PRELIMINARY INJUNCTION

COMES NOW Plaintiff First Horizon Corporation, by and through its attorneys, by way of this Complaint and Application for Preliminary Injunction, and in the above-styled action alleges as follows:

### PARTIES & KEY ENTITIES & PERSONS

1.      Plaintiff First Horizon Corporation is a corporation organized under the laws of Tennessee with its principal place of business in Memphis, Tennessee. First Horizon Bank is a wholly-owned banking subsidiary of First Horizon Corporation (hereinafter collectively referred to as "FH" or "First Horizon").

2.      Made Defendant herein is KARL HOEFER ("Hoefer"), an individual of full age of majority, domiciled in Jefferson Parish, Louisiana. Hoefer is a former employee of First Horizon.

3.      Made Defendant herein is DMMS Holdings LLC ("DMMS"), a Louisiana limited liability company with its domicile address listed as 4459B Bluebonnet Blvd., Baton Rouge, Louisiana 70809, but such address corresponds to the address of its agent for service of process, Cogency Global Inc. Upon information and belief, DMMS's headquarters is located at 201 St. Charles Avenue, New Orleans, LA 70170.

1

4. On information or belief, DMMS's members are Daryl G. Byrd ("Byrd"), who is domiciled in Louisiana, Mark W. Tipton ("Tipton"), who is domiciled in Georgia, Michael J. Brown ("Brown"), who is domiciled in Louisiana, and Scott Price ("Price"), who is domiciled in Alabama.

5. Byrd, Tipton, Brown, and Price are former executives of IBERIABANK ("Iberia"). Byrd was President and CEO. In July 2020, Iberia was purchased by FH and structured as a merger of equals, resulting in the transfer to FH all of the assets, employees, and officers of Iberia. Byrd, Tipton, Brown, and Price all became executives and employees of FH. In fact, pursuant to the merger of equals, Byrd became the Chairman of the Board of FH upon completion of the merger.

6. Byrd, Tipton, Brown, and Price ultimately left the employ of FH, and they recently formed DMMS, which is in the process of acquiring MC Bancshares, Inc. and its wholly owned subsidiary M C Bank & Trust Company ("M C Bank"), with the intent, at least in part, to compete with First Horizon through its locations across south Louisiana and Texas.

**JURISDICTION AND VENUE**

7. This Court may exercise personal jurisdiction over Defendants Hoefer and DMMS because each is domiciled in the State of Louisiana, and the events giving rise to this lawsuit took place in the State of Louisiana.

8. This Court has subject matter jurisdiction over First Horizon's claims pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

9. Hoefer is a citizen of Louisiana for diversity purposes. *See Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 485 F.3d 804, 814 (5th Cir. 2007) ("[O]nce a person

establishes his domicile in a particular state, he simultaneously establishes his citizenship in the same state.")

10. DMMS is a citizen of Louisiana, Georgia, and Alabama for diversity purposes because DMMS is a limited liability company whose members are domiciled in Louisiana, Georgia, and Alabama. *See Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1079-80 (5th Cir. 2008) (holding that the citizenship of a limited liability company (LLC) is determined by the citizenship of all of its members). DMMS has no member domiciled in Tennessee.

11. Complete diversity of citizenship is present because First Horizon is a citizen of Tennessee, while Hoefer and DMMS are citizens of Louisiana.

12. The amount in controversy in this action exceeds the amount-in-controversy requirement set forth in 28 U.S.C. §1332 because Hoefer's breach of compensation agreements with his former employer First Horizon has caused damages to First Horizon in excess of $75,000.

13. Venue is proper in this District because the District encompasses East Baton Rouge Parish which is a place of proper venue for First Horizon's claims.

**<u>RELEVANT FACTS</u>**

14. First Horizon Corporation is a financial services company founded in 1864 and based in Memphis, Tennessee. Through its banking subsidiary First Horizon Bank, it provides financial services through locations in 12 states throughout the southeastern United States and New York.

15. Notwithstanding their former duties and fiduciary obligations owed to FH, Byrd, Tipton, Brown, and Price formed DMMS with an intent to acquire MC Bancshares, Inc. and its wholly owned subsidiary M C Bank & Trust Company ("M C Bank"), with an intent to, at least in part, compete with First Horizon through its locations across south Louisiana and Texas.

3

16.     As part of their strategy, DMMS began targeting bankers and employees of FHC, focusing specifically on persons they had worked with at Iberia, effectively seeking to take back from FH the business goodwill and relationships that they, as executives of Iberia, had sold to FH for billions of dollars, and for which they handsomely benefited personally.  Or as one banking reporter who apparently interviewed Byrd put it: "Ex-IberiaBank CEO is Getting the Band Back Together." *See  https://www.bankingdive.com/news/ex-iberiabank-ceo-daryl-byrd-leads-investor-group-acquire-m-c-bank-louisiana/808354/.*

17.     To date, DMMS has recruited away at least twenty-seven (27) employees of FH, all of whom were former employees of Iberia. They have attempted to recruit a number of additional FH employees, and are presumably still recruiting FH employees, offering substantial signing bonuses and other incentives to persuade the employees to join DMMS.

18.     Karl Hoefer was formerly employed by First Horizon as an Executive Vice President and Regional President for Louisiana and Texas. He resigned his employment on or about December 30, 2025.

19.     In his role as Regional President, Hoefer worked with a wide array of First Horizon employees throughout Louisiana and Texas, including Relationship Managers in First Horizon's Private Banking Department, First Horizon Senior Vice Presidents and Commercial Relationship Managers, First Horizon Market Presidents, and numerous other First Horizon employees at both the executive and local levels. He oversaw market growth, relationship banking strategy, and team development across the region.

20.     While employed by First Horizon, Hoefer received, acknowledged, and accepted Grants of Management Restricted Stock Units ("RSUs"), Restricted Cash Units (Modified

4

Retention Program, Annual Vesting)("Retention RCUs"), and Performance Award – Long-Term Incentive Unit Grants ("LTIs").

21.    Each RSU, Retention RCU, and LTI is awarded by a Grant Notice that sets forth the grant date and vesting date for each award.

22.    The Grant Notices for Hoefer's RSUs, Retention RCUs, and LTIs each provide that, for a Restriction Period of two (2) years following the vesting date of each award, Hoefer is prohibited from recruiting employees of First Horizon or its affiliates to leave First Horizon.

23.    An April 27, 2021 Performance Award of Management LTIs with a vesting date of May 12, 2024, is conditioned upon Hoefer refraining, for a period of two (2) years after the vesting date, "either on [his] own behalf or on behalf of any other person or entity, in any manner directly or indirectly solicit[s], hire[s], or encourage[s] any person who is then an employee or customer of FH or any and all of its subsidiaries or affiliates to leave the employment of, or to end, diminish, or move any of his, her, or its accounts or relationships with, FH or any and all of its subsidiaries or affiliates."[1] With a vesting date of May 12, 2024, the Restriction Period for this award extends to May 12, 2026.

24.    An April 27, 2021 Grant of Management RSUs award with vesting dates of May 12, 2024 and May 12, 2025, is conditioned upon Hoefer refraining, for a period of two (2) years after the vesting date,  "either on [his] own behalf or on behalf of any other person or entity, in any manner directly or indirectly solicit[s], hire[s], or encourage[s] any person who is then an employee or customer of FH or any and all of its subsidiaries or affiliates to leave the employment of, or to end, diminish, or move any of his, her, or its accounts or relationships with, FH or any

---

[1] **Exhibit A,** April 27, 2021 Performance Award of Management LTIs.

and all of its subsidiaries or affiliates."[2] With vesting dates of May 12, 2024, and May 12, 2025, the Restriction Periods for this award extend to May 12, 2026 and May 12, 2027.

25.    A February 10, 2022 Performance Award of Management LTIs with a vesting date of May 12, 2025, is conditioned upon Hoefer refraining, for a period of two (2) years after the vesting date, "either on [his] own behalf or on behalf of any other person or entity, in any manner directly or indirectly solicit[s], hire[s], or encourage[s] any person who is then an employee or customer of FH or any and all of its subsidiaries or affiliates to leave the employment of, or to end, diminish, or move any of his, her, or its accounts or relationships with, FH or any and all of its subsidiaries or affiliates."[3] With a vesting date of May 12, 2025, the Restriction Period for this award extends to May 12, 2027.

26.    A February 10, 2022 Grant of Management RSUs award with a vesting date of May 12, 2025, is conditioned upon Hoefer refraining, for a period of two (2) years after the vesting date, "either on [his] own behalf or on behalf of any other person or entity, in any manner directly or indirectly solicit[s], hire[s], or encourage[s] any person who is then an employee or customer of FH or any and all of its subsidiaries or affiliates to leave the employment of, or to end, diminish, or move any of his, her, or its accounts or relationships with, FH or any and all of its subsidiaries or affiliates."[4] With a vesting date of May 12, 2025, the Restriction Period for this award extends to May 12, 2027.

27.    A May 5, 2023 Retention RCUs award with vesting dates of May 12, 2024, and May 12, 2025, is conditioned upon Hoefer refraining, for a period of two (2) years after the vesting date, "either on [his] own behalf or on behalf of any other person or entity, in any manner directly

---

[2] **Exhibit B**, April 27, 2021 Grant of Management RSUs.
[3] **Exhibit C,** February 10, 2022 Performance Award of Management LTIs.
[4] **Exhibit D,** February 10, 2022 Grant of Management RSUs.

or indirectly solicit[s], hire[s], or encourage[s] any person who is then an employee or customer of FH or any and all of its subsidiaries or affiliates to leave the employment of, or to end, diminish, or move any of his, her, or its accounts or relationships with, FH or any and all of its subsidiaries or affiliates."[5] With vesting dates of May 12, 2024 and May 12, 2025,the Restriction Periods for this award extend to May 12, 2026, May 12, 2027.

28.    In sum, pursuant to the aforementioned incentive grants, FH paid to Hoefer over $1 million conditioned at least in part on his voluntary agreement not to recruit FH employees in the event he left the company.

29.    Hoefer was a key initial recruiting target for Byrd and DMMS.  As a former Iberia banker and employee who continued managing many of the former Iberia bankers and employees after the merger with FH, Hoefer as Regional President was well positioned to be a key recruiter of FH bankers and employees.

30.    Hoefer resigned from First Horizon on December 30, 2025 and began working for DMMS Holdings, LLC ("DMMS") as a consultant in the role of Senior Executive Vice President.

31.    Upon information and belief, once the company acquires M C Bank, or even prior thereto, Hoefer will become a regional president for Louisiana and Texas with the competing bank. First Horizon has locations in both Louisiana and Texas.

32.    First Horizon sent Hoefer a letter on January 9, 2026, reminding him of his obligations to comply with the employee and customer non-solicitation obligations in the RSUs, Retention RSUs, and LTIs that Hoefer accepted and acknowledged while an employee of First Horizon.[6]

---

[5] **Exhibit E,** May 5, 2023 Retention RCUs.
[6] **Exhibit F**, Letter to K. Hoefer dated January 9, 2026.

33.     The January 9, 2026 letter stated, "if you violate your restrictive covenants with FHC, First Horizon will pursue all equitable and monetary remedies and relief available to it, including, but not limited to, the claw back of $1,088,336.40 of your vested Retention RCU, RSU and LTI awards".[7]

34.     As a result of their tenures as executives with FH, the principals of DMMS were intimately familiar with the business practices of FH, including knowing the various types of non-solicit and non-compete restrictions included as part of FH incentive awards to its bankers and employees such as Hoefer.  Notwithstanding, and out of abundance of caution, counsel for FH sent letters to Byrd, Tipton, and Brown reminding them that key FH employees, including specifically Hoefer, were subject to restrictive covenants for non-solicitation and non-competition.

35.     After his resignation, Hoefer brazenly recruited First Horizon employees across Louisiana and Texas at every level of First Horizon's hierarchy

36.     Hoefer and DMMS devised and have employed a scheme whereby a principal of DMMS – either Byrd or Tipton – makes a brief initial phone call to the target First Horizon employee to advise them of the merger deal and the opportunity to work for DMMS. During this brief initial contact, Byrd and/or Tipton directs the First Horizon employee to call Hoefer for more information. Once the employee calls Hoefer, virtually all contact from that point forward is between Hoefer and the First Horizon employee, who, at that point, has not made a decision to leave First Horizon and must be persuaded by Hoefer to do so.  Hoefer "talks up" the DMMS opportunity to the employee, offers them above-market salary, bonuses and other benefits, and pushes the employee to leave First Horizon to come work for DMMS.

---

[7] *Id.*

37.     While Byrd and/or Tipton may make the initial contact with each target employee, Hoefer plays the critical and primary role as the lead recruiter in the recruiting process.  It is not Byrd or Tipton persuading the target employees to leave First Horizon; rather, it is Hoefer who entices and encourages the employees to do so.

38.     It is of no consequence that the target employees initially contacted Hoefer, as the employees were told to do so by Byrd and Tipton as part of the recruiting process. The target employees were then "turned over" to Hoefer, whose job it was to secure the target employee's commitment to leave the First Horizon.  In fact, Hoefer would often make multiple calls and send multiple texts to the target employee after initial contact in an effort to persuade the target employees and ultimately "seal the deal," and Hoefer would continue selling the opportunity even after the target First Horizon employee indicated they were not interested.

39.     In early January of 2026, Hoefer began aggressively recruiting First Horizon employee Ben Marmande by communicating with Marmande via text messages and phone calls.

40.     On or about January 6, 2026, Byrd made the first contact to Marmande but told Marmande that he would need to speak with Hoefer. Thereafter, Hoefer performed all of the recruiting from there because Hoefer had a longstanding relationship with Marmande and intimate knowledge of Marmande's experience working with First Horizon, both of which allowed Hoefer to give Marmande a detailed pitch about how a position with DMMS would differ from Marmande's position at First Horizon.

41.     Later on January 6, 2026, Marmande spoke with Hoefer at length and raised numerous objections to leaving First Horizon. Of note, Marmande mentioned that he has nonsolicitation obligations that would prevent him from soliciting First Horizon employees or customers. Hoefer assured him that any non-solicitation obligations would not present a problem

because DMMS would indemnify Marmande for any consequences of Marmande breaching those obligations, and Hoefer would have Byrd make the necessary calls to solicit customers and employees.

42. When Marmande told Hoefer that he was not interested in leaving First Horizon, Hoefer continued pushing, told Marmande to not say "no" just yet, but to join Hoefer for dinner and hear him out.

43. On or about January 8, 2026, Marmande went to dinner with Hoefer, Byrd and Tipton, which Marmande describes as a pitch to convince Marmande to leave First Horizon.

44. On or about January 14, 2026, Mike Pelletier with DMMS texted Marmande an offer of employment that included a $750,000 signing bonus and a $1 million equity position in the bank. Hoefer separately texted Marmande that it was a good offer.

45. When Marmande called Hoefer to decline the offer, Hoefer told Marmande that he was "making a big mistake" and that "you'll regret this," in a last-ditch effort to convince Marmande to leave his employment with First Horizon.

46. Between January 3, 2026, and January 20, 2026, Hoefer persistently communicated by telephone calls and text messages with Baton Rouge Market President John P. Everett ("Everett") recruiting and encouraging Everett to leave his employment with First Horizon and begin employment with DMMS. In Byrd's initial call with Everett, Byrd said "Karl [Hoefer] can't call you. If you engage Karl, he can talk to you." On or about January 9, 2026, Hoefer attended a lunch with Byrd and Everett and reviewed details of DMMS's plan to acquire M C Bank, including the vision for the capital raise, how to grow the bank, vision for loan sizes, how big the bank would get before going public, and the vehicle and/or process by which the bank would go public.

47.    On or about January 11, 2026, Everett received an offer of employment from DMMS. On or about January 14, 2026, through the course of Everett's discussions with Hoefer, Hoefer texted a picture of attendees at an investor meeting for the planned acquisition of M C Bank. In the subsequent days, Hoefer fielded Everett's additional questions about the venture and his role for M C Bank. On or about January 18, 2026, Everett advised Hoefer that he was declining the offer of employment.

48.    Between January 25 and 28, 2026, Hoefer persistently communicated by telephone calls and text messages with First Horizon Relationship Manager Jake Wharton ("Wharton"), recruiting and encouraging Wharton to leave his employment with First Horizon and begin employment with DMMS. Wharton works out of First Horizon's Baton Rouge, Louisiana office.

49.    Again, Byrd initiated contact with Wharton and provided initial details of the planned M C Bank acquisition, and when Wharton began asking questions about the company's plan for the Baton Rouge market, Byrd immediately directed Wharton to speak to Hoefer. From that point forward, Hoefer was Wharton's only point of contact. On or about January 27, 2026, in a phone call initiated by Hoefer, Hoefer gave a verbal offer of employment that included: (i) a salary of $30,000 above what Wharton was presently receiving from First Horizon; (ii) a $40,000 signing bonus; (iii) a $75,000 "success" bonus when DMMS closes on the M C Bank acquisition; (iv) a minimum $75,000 annual bonus each year thereafter; (v) stock options and/or other incentives; and (vi) $6,000 dues to a country club. The same day, Wharton called Hoefer advising of his decision to decline the offer of employment.

50.    Between January 24 and February 3, 2026, Hoefer persistently communicated by telephone calls and text messages with First Horizon Senior Vice President Kevin Rudge ("Rudge"), recruiting and encouraging Rudge to leave his employment with First Horizon and

begin employment with DMMS. Rudge works out of First Horizon's Baton Rouge, Louisiana office. On January 24, 2026, Tipton initiated contact with Rudge to give an overview of DMMS's plans for M C Bank and advised Rudge to contact Hoefer if Rudge had any questions. Rudge thereafter only spoke with Hoefer. Over the next six days, Hoefer exchanged numerous texts and phone calls with Rudge to address Rudge's questions, and in the course of those conversations Hoefer told Rudge that a big offer was coming. On February 2, 2026, Hoefer called Rudge to formally offer employment with DMMS that included: (i) a substantial raise; (ii) two bonuses, one dependent upon the closing of the M C Bank acquisition; (iii) another guaranteed bonus; (iv) stock in M C Bank; (v) a club allowance; and (vi) indemnification of Rudge should First Horizon seek to enforce Rudge's restrictive covenants. On February 3, 2026, Rudge advised Hoefer that he was not accepting Hoefer's offer.

51.     On February 2, 2026, First Horizon employee Brandon Boudreaux ("Boudreaux") resigned from his employment at First Horizon's Houma, Louisiana office stating he was contacted by Hoefer and had accepted employment with DMMS. Boudreaux told his colleagues that Hoefer made a compelling offer and that Hoefer pushed so hard that Boudreaux admitted to other First Horizon employees that while he was able to resist the initial efforts of DMMS, he found it extremely difficult to tell Hoefer "no" based on their relationship. An additional element of Hoefer's aggressive recruiting of Boudreaux included giving Boudreaux only 24 to 36 hours to decide whether to accept Hoefer's offer and make a significant career change.

52.     The scheme that Hoefer, Byrd, and Tipton employed is prohibited by the Grant Notices and governing incentive plans because the employee non-solicitation provision prohibits Hoefer  from "**either on [his] own behalf or on behalf of any other person or entity,** in any

manner **directly or indirectly** solicit[ing], hir[ing], or encourag[ing]" First Horizon employees to leave their employment to work for a competitor. (emphasis added).

53.     On February 3, 2026, First Horizon sent Hoefer a letter demanding Hoefer cease and desist recruiting its employees to leave First Horizon and work for DMMS.[8]

54.     In response, counsel for Hoefer sent First Horizon's counsel a letter dated February 6, 2026 vehemently denying that Hoefer engaged in any of the activity set forth in this Complaint. More specifically, the letter asserted, in pertinent part, as follows:

> . . . Mr. Hoefer has not violated any restrictive covenants. **Mr. Hoefer has not directly or indirectly solicited, hired, or encouraged any person who is an employee of FHC to terminate their employment with FHC**. Contrary to your unfounded accusations, Mr. Hoefer did not initiate any contact with Mr. Brandon Boudreaux or offer Mr. Boudreaux employment with DMMS Holdings. Mr. Hoefer, in fact, has no authority to hire contractors or employees for DMMS Holdings. **To Mr. Hoefer's knowledge, Mr. Boudreaux left FHC on his own accord**.

(Emphasis added.)

55.     These assertions are obviously contradicted by the very same First Horizon employees whom Hoefer encouraged to leave First Horizon, including specifically Brandon Boudreaux and Ben Marmande.

56.     Hoefer's transparent attempt to circumvent his non-solicitation obligations to First Horizon, with the aid and assistance of DMMS's principals, shows conscious and purposeful deceit.

57.     Based upon the offers of indemnification communicated by Hoefer to Marmande and Rudge, and based upon evidence of a written agreement with another former FH employee who went to work for DMMS, Cleland Powell, which contained such an indemnification provision

---

[8] **Exhibit G**, Letter to K. Hoefer dated February 3, 2026.

by DMMS to Powell, it is presumed that the terms and conditions of Hoefer's employment with DMMS likewise included an indemnification provision whereby DMMS would indemnify Hoefer for the consequences of his violations of his obligations to FH.

58.    Such indemnification of Hoefer would naturally demonstrate a conscious and knowing disregard for Hoefer's duty of loyalty to FH, both by Hoefer and DMMS and its principals, specifically designed to allow Hoefer and other former First Horizon employees to solicit First Horizon employees and ultimately its customers in violation of their non-solicitation obligations without incurring any personal consequences.

59.    Upon information and belief, the negotiations, recruitment, and offers to FH employees involve substantial bonuses and compensation.

60.    Hoefer's and DMMS's scheme to circumvent and frustrate Hoefer's non-solicitation obligations to First Horizon is deceptive, unscrupulous, unethical, and shows intent to harm First Horizon's business and avoid the contractual consequences of doing so.

61.    Hoefer's recruiting and attempt to raid First Horizon employees has already caused, and will continue to cause, losses of employees and substantial losses of money, resources, and an inordinate amount of unnecessary time and focus of FH executives and employees defending against Hoefer's and DMMS's unethical raiding—time and focus that, once lost, can never be redeployed to more important, strategic objectives of the company.

62.    To date, FH has been compelled as a reasonable defensive matter to offer and pay out bonuses and incentives in excess of $5 million to the targets and potential targets of Hoefer's unlawful and unethical recruiting activities.

63.    Upon information and belief, Hoefer and DMMS's raid of First Horizon employees will continue for the foreseeable future, and will expand in scope after February and March 2026, when First Horizon employees receive their bonuses and incentives earned from the prior year.

64.    All of Hoefer's actions were and are taken with the express knowledge and permission, if not at the explicit direction of, DMMS and its principals, and for their obvious benefit.  Indeed, pursuant to their admission in the letter referenced in Hoefer's counsel's response letter noted above, Hoefer himself has "no authority to hire contractors or employees for DMMS Holdings".  Given that, Hoefer's actions were necessarily taken at the behest of DMMS.

**COUNT I:**

**Bad Faith Breach of Non-Solicitation Agreement**

65.    First Horizon adopts, re-alleges, and incorporates all allegations set forth above as if fully restated herein.

66.    An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform *La. C.C. art. 1997*. An obligor is in bad faith if he intentionally and maliciously fails to perform his obligation. *Comment (b) to La. C.C. art. 1997.* The term bad faith "generally implies actual or constructive fraud or a refusal to fulfill contractual obligations, not an honest mistake as to actual rights or duties." *Whitney Bank v. SMI Companies Glob., Inc.,* 949 F.3d 196, 210 (5th Cir. 2020)(quoting *Delaney v. Whitney Nat'l Bank,* 96-2144 (La. App. 4 Cir. 11/12/97), 703 So. 2d 709, 718)).

67.    Employee non-solicitation obligations are not governed or restricted by La. R.S. 23:921. *See Neill Corp. v. Shutt*, 2020-0269 (La. App. 1 Cir. 1/25/21), 319 So.3d 872, 880 ("… unlike the non-solicitation of customers [], the non-raiding and non-interference agreements are strictly contractual. They do not restrain the defendants' exercise of their profession, trade, or

15

business, and are therefore not restricted by La. R.S. 23:921… [and] are thus enforceable contracts.").

68. The First Horizon Grant Notices Hoefer accepted and acknowledged constitute valid and enforceable contracts containing valid and enforceable employee non-solicitation restrictions with Restriction Periods of two (2) years after the applicable award vesting dates.

69. Hoefer breached the employee non-solicitation provisions in the Grant Notices and governing incentive plans by recruiting and making job offers to First Horizon employees encouraging them to leave First Horizon and begin employment with a competitor, DMMS Holdings LLC, during the applicable two (2) year Restriction Periods.

70. Accordingly, First Horizon is entitled to statutory relief for damages for the loss it sustained and/or profits it has been deprived of as the result of Hoefer's breach of his employee non-solicitation restrictions.

71. Hoefer's breach of contract was intentional, willful, wanton, and in completely reckless disregard for the rights of First Horizon.

72. Hoefer's bad faith and continuing actions in violation of the Grant Notices and governing incentive plans expose First Horizon to a pending and ongoing threat of immediate and irreparable harm, including the loss of employees, loss of customer goodwill, and loss of fair competition.

73. If injunctive relief is not granted to put a stop to Hoefer's violation of the terms of the Grant Notices and governing incentive plans, First Horizon will suffer the aforementioned irreparable injury for which there is no adequate remedy at law.

16

## COUNT II:
### Violation of Louisiana Unfair Trade Practices Act ("LUTPA")

74.   First Horizon adopts, re-alleges, and incorporates all allegations set forth above as if fully restated herein.

75.   Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. *La. R.S. 51:1405.*

76.   Under La. R.S. 51:1409(A), any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages.

77.   In the event that damages are awarded under La. R.S. 51:1409, the court shall award to the person bringing such action reasonable attorney fees and costs.

78.   Hoefer, who joined DMMS Holdings, LLC after resigning from First Horizon, has violated and continues to violate the Louisiana Unfair Trade Practices Act ("LUTPA"), La. R.S. 51:1401, et seq., by engaging in and continuing to engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of their business in violation of LUTPA.

79.   Hoefer, individually and as an agent of DMMS Holdings, LLC, solicited, recruited, and offered jobs to Ben Marmande, John Everett, Jake Wharton, Kevin Rudge, and Brandon Boudreaux. Thereafter, Hoefer intentionally misrepresented to First Horizon that he was not involved in recruiting any First Horizon employee to leave First Horizon.

80.   Hoefer's actions amount to fraud, misrepresentation, deception, breach of fiduciary duty, unscrupulous and unethical conduct, including, without limitation, soliciting and diverting First Horizon's employees to DMMS.

17

81. The actions of Hoefer set forth above constitute unfair and/or deceptive trade practices within the meaning of LUTPA, La. R.S. 51:1401, *et seq.*

82. Hoefer solicited and continues soliciting First Horizon employees with the intent of causing harm to First Horizon and helping DMMS gain an unfair competitive advantage over First Horizon.

83. Hoefer's actions offend public policy and are immoral, unethical, unscrupulous, malicious, and designed to cause substantial injury to First Horizon.

84. The actions of Hoefer set forth above have caused and will continue to cause actual loss and damages to First Horizon, including loss of money, in an amount to be determined at trial.

85. Because the actions of Hoefer were and are willful and malicious, First Horizon is also entitled to attorneys' fees under La. R.S. 51:1409(A).

86. Upon notice to the Attorney General, First Horizon will likewise be entitled to treble damages under La. R.S. 51:1409(A).

## COUNT III
### Inducement of Breach of Contract (Against DMMS)

87. First Horizon adopts, re-alleges, and incorporates all allegations set forth above as if fully restated herein.

88. The elements of a claim for inducement of a breach of contract are: (1) the existence of a legal contract between the plaintiff and a third party; (2) the defendant's awareness of the contract; (3) the defendant's malicious intent to induce breach of the contract; (4) a breach of contract proximately caused by defendant's actions; and (5) resulting damages to the plaintiff. *Freeman Mgmt. Corp. v. Shurgard Storage Centers, LLC*, 461 F. Supp. 2d 629, 637 (M.D. Tenn. 2006).

89.    "In the context of a claim for tortious interference with contract, 'malice' is defined simply as the willful violation of a known right." *Id.*

90.    The Grant Notices for Hoefer's RSUs, Retention RCUs, and LTIs each provide that "[t]his award is governed by the substantive laws of Tennessee, without regard to conflicts of law principles."[9]

91.    The Grant Notices for Hoefer's RSUs, Retention RCUs, and LTIs are valid contracts between First Horizon and Hoefer.

92.    DMMS was aware of Hoefer's contractual obligations to First Horizon.

93.    DMMS acted intentionally, with malice and by employing improper means and motives, including for the purpose of harming Plaintiff and aiding Hoefer in the breach of contractual obligations to Plaintiff, to induce Hoefer to breach his contractual obligations to First Horizon by using Hoefer as the lead recruiter to directly and indirectly encourage First Horizon employees to leave employment with First Horizon.

94.    DMMS's utilizing Hoefer to solicit First Horizon employees was the proximate cause of Hoefer's breaching his nonsolicitation obligations.

95.    DMMS's actions in interfering with Hoefer's contractual obligations to First Horizon have caused and will continue to cause actual loss and damages to First Horizon, including loss of employees and loss of money in an amount to be determined at trial.

96.    DMMS was aware that the effects of Hoefer's breach of contract would be felt by First Horizon, not only throughout Louisiana, but also at its headquarters in Tennessee.

97.    The actions of DMMS constitute unlawful inducement of breach of contract under Tennessee common law.

---

[9] **Exhibits A-E.**

19

**COUNT IV**

**Procurement of Breach of Contract in**

**Violation of T.C.A. § 47-50-109 (Against DMMS)**

98. First Horizon adopts, re-alleges, and incorporates all allegations set forth above as if fully restated herein.

99. "In Tennessee, the common-law tort of interference with contract has been codified under the name 'inducement of breach of contract.' *see* Tenn. Code Ann. § 47–50–109, but Tennessee courts have recognized that the statute embodies the same elements as the common-law tort." *Freeman Mgmt. Corp. v. Shurgard Storage Centers, LLC*, 461 F. Supp. 2d 629, 636 (M.D. Tenn. 2006).

100. For the reasons discussed in Count III above, the actions of DMMS constitute unlawful procurement of breach of contract under Tennessee Code Annotated § 47-50-109.

101. First Horizon is entitled to treble damages under Tennessee Code Annotated § 47-50-109 for DMMS's procuring Hoefer to breach his contractual obligations to First Horizon.

**COUNT V**

**Civil Conspiracy (Against All Defendants)**

102. First Horizon adopts, re-alleges, and incorporates all allegations set forth above as if fully restated herein.

103. To recover under a conspiracy theory of liability under Louisiana law, a plaintiff must prove that an agreement existed to commit an illegal or tortious act; the act was actually committed and resulted in the plaintiff's injury; and there was an agreement as to the intended outcome or result. Whether or not a party has engaged in a conspiracy is itself a question of fact. *Pure Air Daigle, LLC v. Stagg*, No. 6:16-CV-01322, 2017 WL 4158834, at \*6 (W.D. La. Sept. 15, 2017).

20

104. Upon information and belief, Hoefer and DMMS (through its principals and agents) engaged in a civil conspiracy by agreeing and planning to solicit First Horizon employees and customers in violation of Hoefer's contractual and ethical duties with the intent of causing harm to First Horizon and helping DMMS gain an unfair competitive advantage over First Horizon.

105. By their actions, Hoefer and DMMS (through its principals and agents) have acted on this agreement by interfering with Hoefer's contractual obligations and engaging in unfair methods of competition and unfair or deceptive acts or practices in the conduct of their business in violation of LUTPA.

## Request For Preliminary and Permanent Injunction

106. First Horizon adopts, re-alleges, and incorporates all allegations set forth above as if fully restated herein.

107. For the harm and loss suffered by First Horizon, and for the harm and loss that will continue into the future but for the intervention of the Court, First Horizon has no adequate remedy at law.

108. Under Federal Rule of Civil Procedure 65, "[t]he court may issue a preliminary injunction" after notice to the adverse party.

109. The elements for obtaining injunctive relief in the Fifth Circuit are well settled. The moving party must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunctive relief will result in irreparable injury; (3) the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) the injunction will not disserve the public interest. *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991); *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.,* 878 F.2d 806, 809 (5th Cir. 1989).

110.    First Horizon is substantially likely to prevail on the merits of the case because it possesses evidence that Hoefer, with the help of DMMS, has violated and is in violation of the restrictive covenants in his Grant Notices and governing incentive plan.

111.    Specifically, Hoefer and DMMS have directly and indirectly encouraged, solicited, and recruited First Horizon employees to leave First Horizon during the applicable Restriction Periods of the employee non-solicitation obligation he agreed to as a condition of his awards.

112.    First Horizon will suffer immediate and irreparable harm if temporary and preliminary injunctive relief is not granted, including the loss of employees, loss of customer goodwill, and loss of fair competition.

113.    First Horizon seeks preliminary and permanent injunctive relief enjoining Hoefer and DMMS from breaching and continuing to breach the duties created by the Grant Notices and governing incentive plans during the applicable Restriction Periods.

114.    The threatened harm to First Horizon outweighs any harm the proposed injunction would have on Hoefer or DMMS, and the proposed injunction would not disservice the public interest.

115.    First Horizon also seeks an Order restraining and enjoining Hoefer, and any other persons or entities acting on his behalf or in active concert with him (including but not limited to DMMS, Byrd, Tipton, and any other agents or employees of DMMS) from directly or indirectly soliciting, hiring, or encouraging any employee of First Horizon to leave the employment of First Horizon or any and all of its subsidiaries or affiliates during the applicable Restriction Periods.

116.    First Horizon is willing to post a bond in an amount the court considers proper in accordance with Fed. R. Civ. P. art. 65(c).

117.   First Horizon further requests compensatory, punitive, exemplary, and other forms of monetary damages allowed by law and all other legal or equitable relief under the law.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff First Horizon Corporation requests that judgment be made and entered in its favor and against Karl Hoefer and DMMS Holdings, LLC as follows:

1. Entry of a preliminary injunction against Karl Hoefer, DMMS, and any other persons or entities acting on their behalf or in active concert with them:

   a. prohibiting them from soliciting First Horizon employees to leave their employment with First Horizon during the applicable Restriction Periods;

   b. prohibiting them from electronic or other communications with any First Horizon employee for the purpose of recruiting, soliciting, or otherwise encouraging them to work for DMMS Holdings, LLC or MC Bank during the applicable Restriction Periods;

2. An award of compensatory damages to First Horizon in an amount to be proven at the trial on this matter;

3. An award of exemplary, treble, punitive, or other monetary damages allowed by law or equity.

4. An award of all costs and attorneys' fees.

Respectfully submitted this 20th day of February, 2026.

> _/s/ Andrew J. Halverson_
> Andrew J. Halverson, LA Bar No. 31184
> Michael C. Ledet, LA Bar No. 40430
> **OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
> 325 Settlers Trace Blvd., Suite 201

Lafayette, LA 70508
Telephone: (337) 769-6582
Facsimile: (337) 989-0441
Email: andrew.halverson@olgetreedeakins.com
michael.ledet@ogletreedeakins.com
***Attorneys for Plaintiff First Horizon Corporation***