UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

FIRST HORIZON CORPORATION

     Plaintiff        Civil Action No. 26-cv-00182-BAJ-EWD

versus             District Judge Brian A. Jackson

              Magistrate Judge Erin Wilder-Doomes

KARL HOEFER and DMMS HOLDINGS, LLC

     Defendants.

**PLAINTIFF FIRST HORIZON CORPORATION'S MEMORANDUM IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION**

Plaintiff First Horizon Corporation ("Plaintiff" or "First Horizon") hereby files this memorandum in support of its Application for Preliminary Injunction. First Horizon seeks an order from this Court enjoining and restraining Defendant, Karl Hoefer, from soliciting, hiring, or encouraging, whether directly or indirectly, any person who is an employee of First Horizon or any and all of its subsidiaries or affiliates to leave their employment with First Horizon or any and all of its subsidiaries or affiliates, as well as enjoin and restrain Defendant, DMMS Holdings, LLC ("DMMS"), and its principals and agents from acting in concert with Hoefer to violate his legal obligations.

## I. INTRODUCTION

In accepting substantial equity awards that were granted to Hoefer throughout his employment with First Horizon, Hoefer agreed that, during his employment with First Horizon and for two years following the vesting date of each award, he would refrain from soliciting or "in any manner" encouraging First Horizon's employees to leave their employment with First Horizon. Nevertheless, after leaving First Horizon to join DMMS, Hoefer deployed a scheme with DMMS to do just that.

1

Beginning in January of 2026, Hoefer and DMMS aggressively recruited numerous First Horizon employees, pressing them to leave First Horizon and presenting them with handsome offers to go work for DMMS. The employees targeted by Hoefer and DMMS worked for or with Hoefer prior to the IBERIABANK merger; consequently, Hoefer was an effective recruiting tool given the relationships and loyalties Hoefer had built up with these employees over the years. Their efforts paid off to First Horizon's detriment and injury, as First Horizon suffered a drain of significant talent, both in terms of the number of employees who resigned and the significant positions many of them held with First Horizon.

First Horizon prays that this Court enter an injunction enjoining Hoefer and DMMS from continuing this recruiting scheme so that First Horizon does not endure any further injury from Hoefer's bad faith breach of contract and from Hoefer's and DMMS's tortious conduct and unlawful trade practices.

## II.    FACTUAL BACKGROUND

First Horizon Corporation provides financial services through its banking subsidiary First Horizon Bank. In July 2020, First Horizon purchased IBERIABANK, resulting in the merger of IBERIABANK'S assets, employees, and officers into First Horizon.  From June of 2019, through his resignation on December 30, 2025, Hoefer held the position of Executive Vice President and Regional President for Louisiana and Texas, starting in such position with IBERIABANK and continuing with First Horizon after the merger.

While employed by First Horizon, Hoefer accepted Grants of Management Restricted Stock Units ("RSUs"), Restricted Cash Units (Modified Retention Program, Annual Vesting)("Retention RCUs"), and Performance Award – Long-Term Incentive Unit Grants

("LTIs").[1] The Grant Notices for Hoefer's RSUs, Retention RCUs, and LTIs each provide that, for a Restriction Period of two (2) years following the vesting date of each award, Hoefer is prohibited from recruiting employees of First Horizon or its affiliates to leave First Horizon.[2] Specifically, in accepting the awards, Hoefer agreed that, for the duration of his restriction period, he would not:

> . . . either on [his] own behalf or on behalf of any other person or entity, in any manner directly or indirectly solicit, hire, or encourage any person who is then an employee or customer of FH or any and all of its subsidiaries or affiliates to leave the employment of, or to end, diminish, or move any of his, her, or its accounts or relationships with, FH or any and all of its subsidiaries or affiliates. The restriction period for this award begins on the Grant Date and ends on the second anniversary of the Vesting Date.[3]

Hoefer's restriction periods remain in effect. After resigning on December 30, 2025, Hoefer immediately joined DMMS, a company started by other former IBERIABANK executives, Daryl G. Byrd ("Byrd"), Mark W. Tipton ("Tipton") and Michael J. Brown ("Brown"). DMMS was formed with the intent to acquire MC Bancshares, Inc. and its wholly owned subsidiary M C Bank & Trust Company ("M C Bank"), and to compete with First Horizon across south Louisiana and Texas. Hoefer was a key initial recruiting target for Byrd and DMMS because Hoefer is a former IBERIABANK employee who continued managing, both directly and indirectly, many of the former IBERIABANK employees after the merger with First Horizon.[4]

On January 9, 2026, First Horizon sent Hoefer a letter, via mail and email, reminding him of his non-solicitation agreements and stating that First Horizon expected full compliance with those agreements and all other post-employment obligations that Hoefer owed to First Horizon. Nevertheless, in blatant disregard of those obligations, since the beginning of January 2026, Hoefer and DMMS's principals have, in conjunction with each other, been actively targeting several

---

[1] R. Doc. 1, ¶ 20.
[2] R. Doc. 1, ¶ 22.
[3] R. Doc. 1, ¶ 21-27; R. Docs. 1-1, 1-2, 1-3, 1-4, 1-5.
[4] R. Doc. 1, ¶ 29.

bankers and other employees of First Horizon, focusing almost exclusively on former IBERIABANK employees who worked for or with Hoefer before the merger.

In a transparent attempt to circumvent Hoefer's non-solicitation obligations, DMMS and Hoefer have unlawfully hatched and engaged in a scheme together whereby a principal of DMMS – either Byrd or Tipton – makes a brief initial phone call to the target First Horizon employee to advise them of the merger deal and the opportunity to work for DMMS. During this brief initial contact, Byrd and/or Tipton directs the First Horizon employee to call Hoefer for more information. Once the employee calls Hoefer, virtually all contact from that point forward is between Hoefer and the First Horizon employee, who, at that point, has not made a decision to leave First Horizon and must be persuaded by Hoefer to do so.[5] Hoefer serves as the lead recruiter and often the sole point of contact in the recruiting process.

To date, DMMS's raid has resulted in dozens of First Horizon employees resigning their employment to join DMMS, a large portion of them directly due to Hoefer's recruitment. While First Horizon is not privy to the specific arrangements or conversations Hoefer and DMMS principals had with these employees  leading up to their departure and will require discovery concerning the same, based on discussions with employees who have stayed, First Horizon has learned that Hoefer was intimately involved in recruiting employees to DMMS, honed in on and leveraged his IBERIABANK relationships, and utilized high-pressure sales tactics when enticing First Horizon's employees to leave. First Horizon believes the conversations with and offers to the departed employees bear a striking resemblance to the following narratives of employees who resisted Hoefer's and DMMS's recruiting efforts:

- Hoefer aggressively recruited First Horizon employee Ben Marmande by encouraging Marmande to accept an offer of employment with DMMS that included a substantial signing bonus, even after Marmande raised concerns about non-solicitation obligations that

---

[5] R. Doc. 1, ¶ 36-37.

4

would prevent Marmande from soliciting First Horizon employees or customers. The offer followed persistent texts and phone calls encouraging Marmande to leave First Horizon, and a dinner that Hoefer encouraged Marmande to attend even after Marmande told Hoefer he had no interest in leaving First Horizon.[6]

- Between January 3, 2026, and January 20, 2026, Hoefer persistently communicated by telephone calls and text messages with First Horizon Baton Rouge Market President John P. Everett, recruiting and encouraging Everett to leave his employment with First Horizon and begin employment with DMMS. On or about January 11, 2026, Everett received an offer of employment from DMMS.[7]

- On January 27, 2026, Hoefer made a verbal offer of employment to First Horizon Relationship Manager Jake Wharton that included various generous bonuses, stock options, and benefits.[8]

- Between January 24 and February 3, 2026, Hoefer persistently communicated by telephone calls and text messages with First Horizon Senior Vice President Kevin Rudge, recruiting and encouraging Rudge to leave his employment with First Horizon and begin employment with DMMS. On February 2, 2026, Hoefer called Rudge to formally offer employment with DMMS that included substantial bonuses as well as indemnification of Rudge should First Horizon seek to enforce Rudge's restrictive covenants. On February 3, 2026, Rudge advised Hoefer that he was not accepting Hoefer's offer.[9]

- On February 2, 2026, First Horizon employee Brandon Boudreaux resigned from his employment at First Horizon's Houma, Louisiana office stating he was contacted by Hoefer and had accepted employment with DMMS. Boudreaux told First Horizon that Hoefer pushed so hard to recruit him that it was extremely difficult to tell him "no" based on their relationship.[10]

Given the above, on February 3, 2026, First Horizon sent Hoefer a letter demanding that Hoefer cease and desist recruiting its employees to leave First Horizon and work for DMMS.[11] In response, counsel for Hoefer sent First Horizon's counsel a letter dated February 6, 2026 representing that Hoefer "has not violated any restrictive covenants", that he "has not directly or indirectly solicited, hired, or encouraged any person who is an employee of FHC to terminate their

---

[6] R. Doc. 1, ¶ 39-45.
[7] R. Doc. 1, ¶ 46-47.
[8] R. Doc. 1, ¶ 49.
[9] R. Doc. 1, ¶ 50.
[10] R. Doc. 1, ¶ 51.
[11] R. Doc. 1, ¶ 53.

employment with FHC", that he did not "offer Mr. Boudreaux employment with DMMS," that he "has no authority" to hire contractors or employees for DMMS, and that to "Hoefer's knowledge, Mr. Boudreaux left FHC of his own accord".[12]

Notwithstanding these representations by Hoefer, which are blatantly contradicted by the solicited employees, including Boudreaux himself, First Horizon's investigation into the matter has revealed that Hoefer and DMMS intend on employing the same tactic in circumventing customer non-solicitation covenants currently binding Hoefer and most of the now-departed First Horizon employees. By separate motion, First Horizon seeks expedited discovery to confirm whether DMMS has agreed (as First Horizon has been told and understands) to indemnify departed employees for breach of their employee or customer non-solicitation obligations. Hoefer's and DMMS's brazen attempt to circumvent binding customer and employee non-solicitation obligations demonstrates conscious and purposeful deceit on their part and is an unethical business practice.

The sudden and significant drain of talent suffered by First Horizon because of Hoefer's unlawful and unethical raid poses a risk of substantial loss and damage to First Horizon. First Horizon has already lost employees, time, and resources, and anticipates Hoefer and DMMS's raid will continue and expand after First Horizon employees receive their bonuses and incentives earned from the prior year in March of 2026. Once bonuses are paid out, Hoefer's previously unsuccessful attempts may yet prove successful, and his unlawful raid will continue unabated unless Defendants' efforts are halted.

On February 20, 2026, First Horizon filed its Complaint and request for injunctive relief.[13] First Horizon now moves for an Order from the Court enjoining Hoefer from soliciting or being

---

[12] R. Doc. 1, ¶ 54.
[13] R. Doc. 1.

involved in the recruitment of First Horizon employees to leave their employment with First Horizon during the applicable Restriction Periods and prohibiting them from electronic or other communications with any First Horizon employee for the purpose of recruiting, soliciting, or otherwise encouraging them to violate their restrictive covenants or work for DMMS Holdings, LLC or MC Bank during the applicable Restriction Periods.

First Horizon is still developing a factual record to support this Application and may supplement with additional information obtained in any expedited discovery.

## III.    LAW AND ARGUMENT

### A.    Legal Standard

On an application for a preliminary injunction, the movant must establish: "(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest." *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023)(citation omitted).

"To show a likelihood of success, [plaintiffs] must present a prima facie case, but need not prove that [they are] entitled to summary judgment." *TitleMax of Texas, Inc v. City of Dallas*, 142 F.4th 322, 329 (5th Cir. 2025). To assess the likelihood of success on the merits, courts look to "standards provided by substantive law." *Id.* (citing *Janvey v. Alguire*, 647 F.3d 585, 595-596 (5th Cir. 2011)).

For the second element, a plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is likely in the absence of an injunction." *Anibowei v. Morgan*, 70 F.4th 898, 902

(5th Cir. 2023)(citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)).

### B. First Horizon is Substantially Likely to Prevail on the Merits of its Bad Faith Breach of Contract Claim Against Hoefer

In its lawsuit, First Horizon has alleged a claim for bad-faith breach of contract against Hoefer, which is amply supported by the myriad of specific factual allegations in First Horizon's Complaint. While Hoefer and DMMS recently filed a Motion to Dismiss, their motion does not challenge the breach-of-contract claim itself, but only that Hoefer did not engage in bad faith in doing so.[14] In essence, by challenging only the "bad faith" element of the claim, Hoefer and DMMS are merely contesting the kinds of damages First Horizon would be entitled to recover upon a showing of bad faith in the breach of Hoefer's contract, *i.e.*, whether First Horizon is entitled to all damages, whether foreseeable or not, that are a direct consequence of his failure to perform (*see* Louisiana Civil Code Article 1997 ("Obligor in bad faith")), or limited to only those damages that were foreseeable at the time the contract was made (*see* Louisiana Civil Code Article 1996 ("Obligor in good faith")). Even so, the allegations in First Horizon's Complaint establish a *prima facie* case of bad faith breach of contract, unfair trade practices, civil conspiracy, and tortious interference.

Notably, in Louisiana, employee non-solicitation agreements are not governed by Louisiana's noncompete statute, La. R.S. 23:921, but by general contract principles. *See Neill Corp. v. Shutt*, 319 So.3d 872, 880 (La. App. 1 Cir. 2021) ("… unlike the non-solicitation of customers [] the non-raiding and non-interference agreements are strictly contractual. They do not restrain the defendants' exercise of their profession, trade, or business, and are therefore not restricted by La. R.S. 23:921…are thus enforceable contracts."). By way of accepting substantial

---

[14] *See* R. Doc. 7.

equity awards from First Horizon, Hoefer agreed to not solicit, hire, or encourage any employee of First Horizon to leave First Horizon. Hoefer agreed to be bound by this restriction for two years following the vesting date of each award, which in this case means his Restriction Period will not expire until May of 2027. Given the millions of dollars in consideration that Hoefer received in exchange for agreeing to the non-solicitation covenant, Hoefer is now required to live up to his end of the bargain.

Louisiana law requires each party to a contract to perform and fulfill the terms of the contract in good faith. *See* La. C.C. art. 1983 ("Contracts have the effect of law for the parties and . . . must be performed in good faith"). An obligor breaches a contract in bad faith "if he intentionally and maliciously fails to perform his obligation." *Whitney Bank v. SMI Companies Glob., Inc.*, 949 F.3d 196, 210 (5th Cir. 2020) (quoting La. Civ. Code art. 1997 cmt. b.). As the Fifth Circuit has observed, "the term bad faith 'generally implies actual or constructive fraud or a refusal to fulfill contractual obligations, not an honest mistake as to actual rights or duties.'" *Id.* (quoting *Delaney v. Whitney Nat'l Bank*, 96-2144 (La. App. 4 Cir. 11/12/97), 703 So. 2d 709, 718).

"A complete catalog of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." <u>Cooper v. Louisiana Organ Procurement</u>, 49,109 (La. App. 2 Cir. 8/6/14), 146 So. 3d 908, 911, <u>writ denied,</u> 2014-2234 (La. 1/9/15), 157 So. 3d 1109.

The factual allegations in this case make clear that Hoefer's breach of his non-solicitation obligations was not an "honest mistake", but rather a calculated undertaking to encourage employees to leave First Horizon despite his obligation not to do so. As described above, Hoefer

9

began soliciting First Horizon employees immediately after his resignation, despite having been reminded of his non-solicitation obligations and told to cease and desist from engaging in such conduct, which brazenly violated those obligations. Hoefer served as the sole recruiter and point of contact after the hand-off from Tipton or Byrd, provided personal pitches to many First Horizon employees, stayed in continual contact via text and phone calls thereafter throughout the process, communicated job offers for employment with DMMS, and was the person to whom employees expressed their acceptance or declination of the offers. Hoefer's actions demonstrate an intentional refusal to abide by his non-solicitation covenant by soliciting and encouraging First Horizon employees to resign.

The allegations in First Horizon's Complaint also demonstrate Hoefer's ill will towards First Horizon. First, Hoefer's and DMMS's coordinated raid began immediately after Hoefer resigned. Hoefer and DMMS's actions demonstrate a desire to seize back for themselves goodwill and relationships they transferred in the IBERIABANK merger. In this regard, they have focused their solicitation efforts on former IBERIABANK employees with whom Hoefer had close relationships that he leveraged to induce their resignations. Furthermore, in their pitch to investors concerning the acquisition of MC Bank, DMMS and Hoefer focus on and attempt to parlay IBERIABANK's success and growth that led to the "merger of equals" with First Horizon.[15] Accordingly, First Horizon will establish a prima facie case and is substantially likely to prevail on the merits that Hoefer breached his contract claim and did so in bad faith with the assistance of DMMS.

---

[15] Exhibit A, Confidential Private Placement Investor Presentation, *see* Page 7-15, 28.

**C.      First Horizon is Substantially Likely to Prevail on the Merits of its LUTPA Claim Against Hoefer and DMMS**

First Horizon's Complaint also demonstrates that it will likely prevail on its claim under the Louisiana Unfair Trade Practices Act ("LUTPA"), La. R.S. 51:1405, *et seq.*

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. La. R.S. 51:1405(A). "A business practice is considered 'unfair' if it offends established public policy and is unethical, oppressive, unscrupulous, or substantially injurious. A business practice is 'deceptive' for purposes of LUTPA when it amounts to fraud, deceit or misrepresentation." *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 309 F.3d 836, 843 (5th Cir. 2002) (citing *Jefferson v. Chevron U.S.A. Inc.*, 713 So.2d 785, 792–93 (La.1998)).

In affirming that LUTPA extends to and regulates a business's conduct towards its competitors, the Louisiana Supreme Court recognized that recruiting at-will employees and encouraging them to resign their employment or join a competitor violates LUTPA if the recruitment involves either "an unlawful or improper purpose" or the use of "unlawful or improper means." *Cheramie Servs. v. Shell Deepwater Prod.,* 35 So. 3d 1053, 1060 (La. 2010). In *Cheramie,* the plaintiff had a staffing agreement to supply workers for an oil company's offshore platform. *Id.* at 1054-55. When interviewing a worker sent by plaintiff for an open position, the oil company told the worker that, if they wanted the job with the oil company, they had to work for plaintiff's competitor. *Id.* at 1055. The worker promptly resigned her employment with the plaintiff and signed up with the competitor staffing company. *Id.*   While the plaintiff ultimately failed on the particular facts of that case to withstand a motion for summary judgment, the alleged conspiracy between the oil company and the competing staffing company to siphon away employees from

11

plaintiff's staffing company was certainly sufficient to state a valid claim under LUTPA. *Id.* at 1063.

Other states that similarly prohibit unfair and deceptive acts or practices have likewise found a plaintiff states a prima facie claim when a competitor causes, facilitates, induces, and/or participates in plaintiff's former employees breaching their non-solicitation covenants. *See, e.g.,* Fla. Stat. Ann. § 501.204 (West); *TriNet USA, Inc. v. Vensure Emp. Servs., Inc.*, No. 8:20-CV-2018-VMC-AAS, 2021 WL 2661108, at *7 (M.D. Fla. June 29, 2021)(allegations that defendant caused, facilitated, induced, and/or participated in former employees of plaintiff breaching their non-solicitation covenants for defendant's benefit stated a claim for relief against a competitor under the Florida Deceptive and Unfair Trade Practices Act).

Separately, a party's bad faith breach of contract also gives rise to a violation of LUTPA. *Volentine v. Raeford Farms of Louisiana, LLC*, 50,698 (La. App. 2 Cir. 8/15/16), 201 So. 3d 325, 353–54 (Defendant's bad faith termination of the contract rendered it liable under  LUTPA.").

As discussed extensively above, the allegations in First Horizon's complaint demonstrate that Hoefer and DMMS have an improper purpose and have utilized improper means in their scheme to circumvent Hoefer's nonsolicitation covenant and leverage Hoefer's relationships to poach First Horizon's employees. Under *Cheramie*, such scheme between Hoefer and DMMS constitutes an unfair or deceptive act or practice that runs afoul of LUTPA.

Furthermore, DMMS and Hoefer's scheme constitutes a bad faith breach by Hoefer of his non-solicitation covenants with First Horizon, which in turn violates LUTPA. *See Volentine, supra*. The fact that DMMS participated in the scheme further makes it liable *in solido* with Hoefer. *See La. C.C. art. 2324; Brown & Root Indus. Servs., LLC v. Brown*, No. CV 21-00291-BAJ-SDJ, 2024 WL 4595597, at *8 (M.D. La. Oct. 28, 2024). Moreover, if the representation made by Hoefer's

12

counsel in his February 6, 2026 letter was true, and Hoefer does not have the authority to hire contractors or employees for DMMS, the job offers that Hoefer freely handed out must have necessarily come from DMMS itself, further underscoring the fact that Hoefer and DMMS were in cahoots together.

DMMS has likely also encouraged Hoefer's bad faith. First Horizon believes discovery will confirm that Hoefer's arrangement with DMMS includes an indemnification provision whereby DMMS promises to make Hoefer whole should he be held liable for engaging in misconduct in recruiting First Horizon's employees. Should this be the case, such provision would demonstrate Defendants' knowing disregard for and bad faith breach of Hoefer's legal and contractual obligations to First Horizon. Hoefer's and DMMS's actions demonstrate their intent to use any means necessary to damage First Horizon's competitive position.

Prior to filing this lawsuit, First Horizon demanded that Hoefer cease his unlawful actions, and in response, Hoefer intentionally misrepresented to First Horizon that he "has not directly or indirectly solicited ... or encouraged any" First Horizon employee to resign their employment. This misrepresentation coupled with his and DMMS's deceptive recruiting scheme constitutes an unethical business practice in violation of LUTPA.

### D.      First Horizon will Suffer Irreparable Harm with No Adequate Remedy at Law if a Preliminary Injunction is not Granted

Irreparable injury is "harm for which there is no adequate remedy at law." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). "[I]t is not necessary to demonstrate that harm is inevitable . . . [t]he plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Anibowei*, 70 F.4th at 902 (citing *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986)).

13

Hoefer's and DMMS's lightning raid of First Horizon employees has already caused and will continue to cause harm to First Horizon by way of a substantial loss of valued talent for which there is no adequate remedy at law. The loss caused by breach of employee non-solicitation covenants is "inherently difficult to measure in terms of dollars" and includes "the inability to recruit and train replacements of key personnel within a short period of time." *WorldVue Connect Glob., L.L.C. v. Szuch*, 155 F.4th 472, 486 (5th Cir. 2025). Moreover, the unlawful raiding of numerous employees in a short amount of time necessarily impacts a company's ability to service and support its customers, not only due to fewer employees, but also due to the adverse impact that abrupt departures have on customer relationships.  This, in turn, could lead to a loss in customers, reputation and goodwill, none of which is inherently quantifiable. *See, e.g., id.* (finding that if *WorldVue* could not support its customers quickly and efficiently, it "risks losing" customer contracts and "harming the reputation of the company", damages that would be difficult to quantify). Further adding to First Horizon's injury for which there is no adequate remedy is the inordinate amount of unnecessary time and focus of First Horizon executives and employees defending against Hoefer's and DMMS's unethical raiding—time and focus that, once lost, can never be redeployed to more important, strategic objectives of the company. Hoefer and DMMS's raid of First Horizon employees will also continue for the foreseeable future as DMMS moves toward establishing a banking business in Louisiana and Texas.    In addition to the myriad of talented employees First Horizon has already lost, the company faces a continuing threat of losing additional personnel to Hoefer and DMMS's unlawful recruiting scheme, which, as noted above, could likewise lead to a loss of clients. A preliminary injunction would mitigate this unquantifiable harm and prevent it from continuing.  *See, e.g., JPMorgan Securities LLC v. Manne*, 2016 WL 7223358, at *3 (M.D. La. Dec. 12, 2016) (finding that JPMorgan had no adequate remedy at law

because its losses would "be difficult to quantify" and that as a result, it would "suffer irreparable harm and loss if Defendant is permitted to solicit JPMorgan's clients and employees on behalf of Morgan Stanley Smith Barney LLC, a direct competitor of JPMorgan"); *OMNI Energy Servs. Corp. v. Carter*, 2008 WL 11355068, at *1 (E.D. La. Apr. 16, 2008) (finding that OMNI would have no adequate remedy at law if the defendant was permitted to solicit OMNI's customers and employees).

### E.    A Preliminary Injunction Would Not Harm Defendants and Would Not Disservice the Public Interest.

The harm to Hoefer and DMMS of a preliminary injunction is low because the injunction serves to enforce Hoefer's contractual obligations to First Horizon. If enjoined from violating Hoefer's contractual obligations to First Horizon, DMMS and Hoefer would remain free to use proper channels and ethical methods of establishing their banking business in Louisiana and Texas. On the other hand, the injury that First Horizon has suffered and that will continue absent a preliminary injunction – the significant loss of employees, time, resources, and eventually customers - is substantial and exactly what First Horizon seeks to prevent by including restrictive covenants in its compensation awards.

The requested injunctive relief would not adversely affect any pubic interest; in fact, it is supportive of the public interest in enforcing the terms of contracts between "sophisticated parties" to promote "certainty and fairness." *Catalyst Strategic Advisors, L.L.C. v. Three Diamond Capital SBC, L.L.C.,* 93 F.4th 870, 879 (5th Cir. 2024). Hoefer and DMMS are each well aware of Hoefer's contractual obligations and the injury posed to First Horizon by breach of those obligations. Each should be enjoined from in any manner violating Hoefer's or any other employee and customer non-solicitation obligations.

15

## IV. CONCLUSION

As shown herein, First Horizon is likely to succeed on the merits of its claims. The evidence and facts in the record show that Hoefer has breached his contract with the assistance of DMMS. Due to the acute danger posed by Hoefer and DMMS's actions, First Horizon must seek injunctive relief from this Court to mitigate and prevent the ongoing harm Hoefer and DMMS are causing. To that end, First Horizon respectfully urges the Court to enter a Preliminary Injunction. First Horizon further requests expedited consideration and that the parties be permitted to engage in expedited discovery, as set forth in First Horizon's Motion for Expedited Discovery and Motion for Expedited Consideration.

*/s/ Andrew J. Halverson*
Andrew J. Halverson, LA Bar No. 31184
Michael C. Ledet, LA Bar No. 40430
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
325 Settlers Trace Blvd., Suite 201
Lafayette, LA 70508
Telephone: (337) 769-6582
Facsimile: (337) 989-0441
Email: andrew.halverson@ogletreedeakins.com
michael.ledet@ogletreedeakins.com

***Attorneys for Plaintiff First Horizon Corporation***

16

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the above and foregoing document has this date been served to all known counsel of record in this proceeding by:

( )    Hand Delivery                    ( )    Prepaid U.S. Mail

( )    Facsimile                        ( )    Federal Express

( )    E-Mail                           ( X )  CM/ECF System

Lafayette, Louisiana, this 12th day of March, 2026.

*/s/ Andrew J. Halverson*
Andrew J. Halverson

17

95873306.v1-OGLETREE